```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION


Mark A. Potter,                    :

        Plaintiff,                 :

     v.                            :     Case No. 2:10-cv-696

SABIC Innovative Plastics US,      :     MAGISTRATE JUDGE KEMP
LLC,
                                   :
        Defendant.
```

OPINION AND ORDER

Plaintiff, Mark A. Potter, a former employee of SABIC Innovative Plastics (and, before that, the General Electric Company) stopped working in 2008 after thirty-six years of employment.  In 2009, he filed an application for benefits with his employer-sponsored long-term disability plan, claiming that he had become disabled due to a tremor condition.  His claim was denied initially and again after he appealed the first denial.  Having exhausted his administrative remedies, he filed this civil action in the Court of Common Pleas of Washington County, Ohio, on June 30, 2010.  Because the plan which insures Mr. Potter is an ERISA plan, SABIC removed the case to this Court on federal question grounds.  See 28 U.S.C. §§1331 & 1441(a).

The Court conducted the initial pretrial conference on October 5, 2010.  Prior to the conference, the parties consented to the Magistrate Judge's jurisdiction over the entire case and Judge Holschuh referred the case to me.  The parties agreed on a briefing schedule and, pursuant to that schedule, have filed the administrative record and competing motions for judgment on the record.  This Opinion and Order represents the Court's decision on those motions.

                                I.

As an introductory matter, the Court notes that the parties' memoranda are not consistent on the way in which portions of the administrative record are identified.  Additionally, the Court cannot find page numbers on much of the record other than the markings which appear at the top of each page and which were generated by the Court's electronic filing system.  This Opinion and Order will therefore refer to the record by the document number and page number which appear in blue at the top of each page.  Some uniform and legible numbering system for a record this extensive would have been helpful, however.

These are the basic uncontested facts.  Mr. Potter has, for years, suffered from a tremor disorder that causes his hands and arms to shake.  In May, 2008 he was employed by SABIC as a landfill truck driver and equipment operator.  He was covered by a group disability plan sponsored by SABIC and administered by Sedgwick Claims Management.  He stopped working on May 8, 2008, and has not worked since.

In November, 2009, Mr. Potter applied for long-term disability benefits under the SABIC plan.  His application was supported by a statement from his treating doctor, Dr. Hanna, who expressed the opinion that Mr. Potter could not work due to his severe involuntary tremors.

In a letter dated January 8, 2010, written by a Sedgwick claims examiner, Mr. Potter's application was denied.  The key paragraph of that letter (Doc. #15-1, at 10) reads:

> The objective clinical information received from your Physician (sic), Dr. Hanna and Dr. Kennel, does not document a severity of your condition(s) that supports your inability to perform the duties of any job in which you qualify based on Training, Education and Experience.  An independent review was completed and found that your impairments may limit your working ability, but are not permanently disabling from any and all jobs in which you may qualify.  As a result, your claim for Disability Pension benefits is denied.

As was his right, Mr. Potter appealed that denial. In a lengthy letter written by counsel dated April 30, 2010, he argued that, based on additional opinions of his family doctor and his neurologist, and also on disability awards made by another insurer and by the Social Security Administration, he met the plan's criteria for total disability. He also pointed to a work evaluation which concluded that he could not do any fine manipulation, arguing that this restriction would prevent him from obtaining a job which paid at least 80% of the earnings of his job with SABIC. Doc. #15-1, pp. 35-46.

SABIC's final denial of Mr. Potter's claim came on June 18, 2010. The grounds for that decision were fairly narrow. SABIC did not dispute that Mr. Potter had the condition of "familial/essential tremor" or that it prevented him from doing his usual work. However, because a beneficiary of the SABIC plan is entitled to receive long-term disability benefits only if the beneficiary is unable to perform any position for which the beneficiary has the training, education or experience to perform, and because SABIC concluded that Mr. Potter could do jobs meeting that description despite his tremor, his claim was denied. Doc. #15-3, at 98-99. The denial was based primarily upon a review conducted at Sedgwick's request by Dr. Petrie, who was critical of Mr. Potter for not following up with his neurologist for almost four years, noting that he also did not follow recommendations from the neurologist concerning non-pharmalogical treatment, and who observed that Mr. Potter's decision to continue to drive supported the finding that he could do jobs not requiring fine manipulation with his upper extremities. Id. It was shortly after that denial that Mr. Potter filed suit.

II.

In moving for judgment on the administrative record, Mr. Potter makes the following arguments. First, he contends that

SABIC (or Sedgwick) did not take into account videos he submitted which showed the difficulty he had with such activities as buttoning a shirt, pouring a bowl of cereal or a glass of water, using a screwdriver, or typing on a computer.  Second, he argues that SABIC ignored a favorable decision rendered by the Social Security Administration on his claim for social security disability benefits and similarly ignored a decision by another insurer, MetLife, which granted him long-term disability benefits.  Next, he raises a series of claims about the way in which SABIC dealt with the opinions of his treating physicians, a functional capacity assessment done by a therapist, and the views of its own experts.  He also takes issue with the fact that SABIC did not request that he be examined by its physicians and that it did not have before it evidence that he could do other jobs.

                              III.
     The starting point in any case involving a claim for benefits under an ERISA plan is identifying the standard under which the Court reviews the administrative decision.  That is generally determined by the language of the plan itself, and depends upon the level of discretion afforded to the administrator in making benefits decisions.

     Here, the applicable plan language is found in Section XX of the plan, entitled "Administration."  Paragraph XX(6), Committee Decisions, provides that any decision of a "Named Fiduciary ... shall lie within the absolute discretion of such entity ...."  Doc. #15-4, at 74.  Mr. Potter concedes that the plan administrator, who is a "Named Fiduciary," is granted enough discretion by this language to trigger the "arbitrary and capricious" standard of review.  Under this standard, the Court is required to uphold the decision of a plan administrator if "it is possible to offer a reasoned explanation, based on the evidence, for [that] outcome."  <u>Davis v. Ky. Fin. Cos. Ret.</u>

Plan, 887 F.2d 689, 693 (6th Cir.1989).  This is the least demanding standard under which a court reviews administrative decisions.  See Haus v. Bechtel Jacobs Co., LLC, 491 F.3d 557, 561-62 (6th Cir. 2007).  Nevertheless, it still requires the Court to undertake a detailed review of the record and to consider the evidence before the administrator, as well as a variety of other factors, in determining if the plan's denial of benefits is sufficiently tied to that evidence and can be supported by a reasonable explanation for the decision.  See Jones v. Metro. Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004).

IV.

The important evidence which was before the plan administrator can be summarized as follows.  It consists primarily of medical records and reviews of those records, but also contains the decision from the Social Security Administration.  Because the focus of this case is Mr. Potter's physical capabilities, the Court's summary of the records reflects a similar focus, and records pertaining to his anxiety and depression will be cited only as necessary to provide a complete picture of his condition.

A.  Reports from Treating or Examining Sources

Dr. Kennell, a psychologist, interviewed Mr. Potter in August, 2008.  He administered a number of tests and also did a clinical interview.  Dr. Kennell diagnosed generalized anxiety which became more specific when Mr. Potter was asked to do fine motor activities.  He was uncertain if Mr. Potter had Attention Deficit Disorder.  He concluded that the anxiety worsened the tremor and that he could not "fully engage in his job anymore" for that reason.  (Doc. #15-2, 86-94).

On November 12, 2009, Dr. Hanna completed a physical capacities assessment form.  On it, he indicated that Mr. Potter could lift, carry, push or pull ten pounds occasionally, and also

could occasionally bend, stoop, crouch, twist, reach at or above shoulder level, and flex and extend his neck, but he could never balance, use vibrating tools or equipment, or use his hands repetitively. He described all of these limitations as permanent. (Doc. #15-2, 3).

Dr. Hanna reported on March 22, 2010, that Mr. Potter had been diagnosed with his tremor many years before and that various medications had been tried in order to control it, but these medications were largely ineffectual. Dr. Hanna described the tremor as "one of the most severe that I have seen" and noted that it precluded Mr. Potter from performing both gross and fine motor skills and functions. Because his current job required typing, writing, and operating machinery, and he could not do any of these things, Dr. Hanna believed him to be disabled. (Doc. #15-1, 59).

Dr. Hanna was contacted by Dr. Petrie, a medical reviewer, on May 13, 2010. He reiterated his belief that due to the problems with his upper extremities, Mr. Potter was disabled. He acknowledged that Mr. Potter had only gone to the Cleveland Clinic once for evaluation and not returned, and he believed that Mr. Potter drove himself to his office appointments. Dr. Petrie also contacted Dr. Sole, who confirmed that the tremor was limited to the upper extremities and that it did not occur at rest. He did believe that medications for ADHD would worsen the tremor. (Doc. #15-3, 90-94).

Dr. Sole, who practices with Parkersburg Neurological Associates, wrote a letter on March 1, 2010, stating that Mr. Potter had been receiving treatment from that practice group since 2001, and that he had been last seen on February 5, 2010. Dr. Sole reported that Mr. Potter was "unable to work secondary to the tremor" and that he could not write, nor could he perform either fine or gross movements without experiencing severe

tremor.  Dr. Sole believed that if Mr. Potter attempted to work he "would put himself as well as others at risk secondary to the severe tremor."  (Doc. #15-2, 27).  The notes of the February 5, 2010 visit reflect a similar opinion concerning Mr. Potter's ability to work.  (Doc. #15-2, 29-30).

    A therapist at the Marietta Memorial Hospital did a functional capacity evaluation of Mr. Potter on February 3, 2010. The specific test performed was described as an "Upper Extremity/Hand PCE."  Mr. Potter's effort was maximal.  His tremor was noted and was more pronounced when he was not putting a load on his muscles.  He was unable to complete a test involving putting pegs, washers and sleeves on a board.  It was noted that he was "unremarkable during gross motor activities." His restrictions were in the area of "work that require (sic) upper extremity fine motor dexterity and coordination" including "writing, typing, and manipulation of small objects, tools and pieces."  (Doc. #15-2, 50-59).

### B.  Physician Reviews

    Dr. Ahmed, a neurologist, was asked by Sedgwick to review Mr. Potter's medical records.  In a report dated December 29, 2009, he noted that Mr. Potter had been treated for his tremor since 1993 (and had been treated for other conditions as well, including anxiety and depression).  First, he obtained treatment from the Cleveland Clinic, then from Parkersburg Neurological Associates, and finally from his current treating physician, Dr. Hanna.  By October, 2008, Dr. Hanna had concluded that Mr. Potter could no longer work.  Dr. Ahmed tried to contact Dr. Hanna but the two traded telephone messages and, at least prior to this report, never spoke.  Dr. Ahmed concluded that Mr. Potter suffered from a severe tremor exacerbated by anxiety and that it affected his fine motor skills.  However, because Mr. Potter was still driving a car, Dr. Ahmed believed he could also drive a

truck, which was part of his job with SABIC.  Nevertheless, he recommended that an occupational therapist or physician see Mr. Potter to determine if he could actually do all of the activities required by his job.  (Doc. #15-1, 1-6).

Dr. Suvalsky, a psychiatrist, wrote a report three weeks earlier in which she commented on Mr. Potter's depression and anxiety.  She had also written a number of prior reports about his psychological conditions.  She had recently spoken to Dr. Hanna about these disorders and concluded that, other than restricting Mr. Potter from doing fine manipulation because that increased his anxiety level which, in turn, exacerbated his tremor, he did not have any work-related limitations from either anxiety or depression.  (Doc. #15-2, 10-14).

Shortly after Sedgwick wrote its letter of January 8, 2010 initially denying Mr. Potter's claim, Dr. Ahmed submitted a revised report.  In that report, dated January 20, 2010, Dr. Ahmed indicated that he had been able to speak to Dr. Hanna, and that Dr. Hanna had told him that certain medications had been tried (including medications referred to in Dr. Ahmed's earlier report) but that Mr. Potter could not tolerate them.  Dr. Ahmed's assessment of Mr. Potter's condition did not change, and he reiterated that Mr. Potter could probably do his job at the landfill, but he admitted that he was "not sure how much of his fine motor skills are needed to carry out his job." Doc. #15-1, 14-19.

Sedgwick relied extensively on Dr. Petrie's evaluation of May 17, 2010 when denying Mr. Potter's claim.  That evaluation appears at pages 90-94 of Doc. #15-3.  The Court will summarize it in some detail because it is one of the key documents in the case.

Dr. Petrie reviewed records from Dr. Sole, Dr. Sweeney, Dr. Hanna, and Dr. Kennell, among others.  He also spoke with Dr.

-8-

Hanna and Dr. Sole. Dr. Petrie concluded that Mr. Potter suffered from a familial/essential tremor affecting his coordination and use of his upper extremities to the extent that he could not perform fine manipulative activities. This would disable him from occupations requiring driving and, in fact, disabled him from his previous occupation as a truck driver. To that extent, the disability was not likely to improve. Mr. Potter also had a comorbid anxiety disorder and suspected ADD. Dr. Petrie noted that although he believed that Mr. Potter could do jobs not requiring fine manipulation, "[w]hether such jobs exist in the employee's community, and whether they are within his sphere of education, training, or experience, is a question to be answered through a vocational assessment." Nevertheless, Dr. Petrie indicated that Mr. Potter was not disabled from "any occupation for which he is suited based on education, training or experience."

### C. The Claim Denial Letters

The first claim denial letter, dated January 8, 2010, does not say so specifically, but it appears to have relied on the evaluations done by Drs. Ahmed and Suvalsky. It stated, briefly, that the objective clinical evidence from Drs. Hanna and Kennel did not document a condition that would prevent Mr. Potter from doing some jobs for which he was qualified. It did not conclude, one way or the other, if he could still do his regular job, nor did it identify any specific job which he could perform. Doc. #15-1, 10.

SABIC's final claim denial letter is dated June 18, 2010, and is found at Doc. #15-3, pp. 98-99. It contains little analysis that is independent of Dr. Petrie's report, quoting from that report extensively and adopting the conclusion that Mr. Potter does not meet the plan definition of disability because he is not disabled from occupations for which his education,

training or experience make him a suitable employee.  The letter makes no mention of the other disability awards and no mention of Dr. Petrie's comment about a vocational assessment being necessary to determine if, in fact, there are jobs which Mr. Potter could do notwithstanding his limitations.  It also makes no reference to any earlier reports from medical reviewers, including Drs. Ahmed and Suvalsky.

V.

A number of the issues raised by Mr. Potter do not merit reversal of the administrative decision.  However, at least one, and perhaps two, of his claims persuade the Court that he is entitled to have SABIC investigate his claim further because its current decision fails to satisfy even the "arbitrary and capricious" standard of review that applies here - which, as the Court of Appeals has held, does not require the federal courts to "rubber-stamp" any and all administrative decisions made under an ERISA plan.  See Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).

A. The Absence of Vocational Evidence

According to the summary plan description, there are two bases on which SABIC could legitimately deny a claim for long-term disability benefits: either (1) the claimant is still able to perform his or her present job despite a "medically determinable, permanent physical or mental impairment"; or (2) the claimant is able to earn at least 80% of his or her pre-disability earnings either doing his or her regular occupation, or by working for "[a]ny other available employer or job in your local economy for which you are reasonably fitted by your remaining capacities and by your education, training, or experience." See Doc. 15-7, at 63.  The local economy is defined to include the area "60 miles from your residence at the time of disability." Id.  This is essentially a restatement of the same

definition of disability that appears in the Plan itself. See Doc. #15-4, 88.

Although SABIC's memoranda imply that Mr. Potter might still be able to work as a truck driver, citing to Dr. Ahmed's report, as supported, that was not the basis of the final denial of his claim. In the last denial letter, Mr. Potter was determined to be disabled from his job with SABIC, and the basis of the denial was Dr. Petrie's statement that he was not disabled from performing other, unspecified jobs for which he was suited by his experience, education and training. The flaw with this decision is that the record contains absolutely no evidence of what types of jobs Mr. Potter might be suited for based on whatever level of experience, education and training he might have; no evidence of whether any such jobs actually exist within sixty miles of his residence; and no evidence of whether these jobs pay at least 80% of his pre-disability earnings.

In McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161 (6th Cir. 2003), the Court of Appeals also reviewed a decision of a plan administrator under an arbitrary and capricious standard of review. There, the plan entitled an employee to disability benefits only if he or she was unable to perform "any and every occupation, business or employment for wages, compensation, or profit." Id. at 163. The administrator terminated benefits based on the opinion of a reviewing psychiatrist that the claimant could return to work. In reversing the decision, the Court of Appeals concluded, among other things, that such a decision could not be made without some evidence of what jobs the claimant could perform. The holding of McDonald has been specifically applied to a plan with language similar to the SABIC plan concerning the ability to earn at least 80% of pre-disability earnings. In Crider v. Highmark Life Ins. Co., 458 F.Supp. 2d 487, 507 (W.D. Mich. 2006), the court stated that

"[t]he Sixth Circuit has consistently held that a plan administrator responsible for terminating benefits under this type of long-term disability policy must (1) identify the type of jobs that the administrator believes plaintiff is capable of performing; and (2) make a sufficient inquiry into whether the jobs it has identified are jobs the claimant can reasonably perform in light of the claimant's specific functional limitations."

It may not be strictly necessary that in every such case, the plan administrator retain the services of a vocational expert. See, e.g., Douglas v. General Dynamics Long Term Disability Plan, 43 Fed. Appx. 864 (6th Cir. August 7, 2002); see also Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276 (10th Cir. 2002).  However, there must be at least some evidence from a qualified source addressing the issue of the claimant's ability to work – and, if the plan specifies matters such as an amount of earnings and a particular geographic area in which work must be available, evidence on those issues as well.  As the Caldwell court observed, plan language like that involved in this case "requires a complicated evaluation of a claimant's abilities, skills and education as well as an assessment of the labor market in a claimant's geographic region."  Id. at 1289. Although Caldwell declined to adopt a categorical rule in favor of vocational expert testimony in all such cases, it held that the determination of whether the absence of such evidence rendered the plan administrator's decision flawed is to be made on a case-by-case basis, and that it is only when "a claims administrator can garner substantial evidence to demonstrate that a claimant is, in fact, able to perform other occupations (within the definition set out by the insurer) in the open labor market" that "consideration of vocational expert evidence is unnecessary." Id.

Here, Dr. Petrie, upon whose report SABIC relied to determine that Mr. Potter could do other jobs, admitted that he could not answer these types of questions and that a vocational assessment would be needed to do so. However, no such assessment was ever obtained. Dr. Ahmed's report did not address this issue, either, because he believed that Mr. Potter could return to his work at SABIC, but that is not the conclusion reached in the final denial letter. Without this type of evidence in the record from any source, the decision that Mr. Potter could not continue in his present job due to his impairments, but that he did not meet the plan definition of "disabled," is necessarily arbitrary and capricious because the decision was made without any factual basis.

The Court notes that, throughout its memoranda, SABIC argues that the keystone of the "arbitrary and capricious" standard of review is the process followed by the claims administrator, rather than the end result. Certainly, process issues weigh heavily in the Court's decision-making, but just because a claimant was afforded a thorough review process, it does not necessarily follow that the decision reached at the end of that process is immune from judicial scrutiny. As the Court of Appeals observed in Baker v. United Mine Workers of America Health and Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991), "[a]pplying the abuse of discretion standard in this context requires that the Trustees' decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." The Court of Appeals has consistently reaffirmed this formulation. See, e.g., Schwalm v. Guardian Life Ins. Co. Of America, 626 F.3d 299, 308 (6th Cir. 2010). Clearly, the second prong of this test - whether the decision is supported by substantial evidence - requires the Court to focus on the evidentiary support for the administrative

decision and not just the process.  And when that support is lacking, the administrator cannot make the kind of "reasoned judgment" that is required even under the arbitrary and capricious standard.  See, e.g., Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 618 (6th Cir. 2006)(a plan administrator "could have made a reasoned judgment only if it relied on ... evidence ...").

In this case, the effect of SABIC's failure to obtain any type of vocational evidence is especially significant.  SABIC, through Sedgwick, ultimately accepted the proposition that Mr. Potter could not do fine manipulation with his hands or arms - which, by the way, basically eliminates any issue about the video he submitted, since it simply confirms that finding.  But it assumed, without evidence, that there are jobs within a sixty-mile radius of Mr. Potter's home that can be performed, from a physical standpoint, by someone who was not limited in the use of his lower extremities but who could perform only gross manipulations or movements with his hands and arms.  Such jobs may exist somewhere; in fact, they may even exist within the relevant geographic area, but there is nothing in the record to support that conclusion, nor the conclusion that Mr. Potter's specific education, training and experience level would qualify him for these jobs, nor, finally, the conclusion that any of these jobs pay at least 80% of his pre-disability earnings.  Because, under the language of the plan itself, all of these findings have to be made by the plan administrator once the claimant demonstrates an inability to perform his or her usual job, evidence on these factual issues is critical to a reasoned determination of the case.  Without it, such a determination simply cannot be made, and it was not made here.

B.  Other Issues

The only other issue which concerns the Court is the

complete lack of acknowledgment of the Social Security Administration's award of benefits. As SABIC correctly points out, such failure, by itself, is not ordinarily a sufficient basis to find that a decision is arbitrary and capricious, at least where the administrator has not encouraged the claimant to apply for social security benefits and the plan does not benefit financially from an award of those benefits. See, e.g., Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir. 2005)("the SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious"). Nevertheless, the failure to discuss or even mention such an award is some evidence of the arbitrariness of the decision-making process because "a disability determination by the Social Security Administration is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan." Glenn v. MetLife, 461 F.3d 660 (6th Cir. 2006).

Again, under the facts of this case, such an award is particularly relevant because under Social Security regulations, a claimant who cannot perform the requirements of his or her past job is deemed disabled only if the claimant cannot perform any other work that exists in the local, regional, or national economies which would be available to the claimant based on his or her education, physical capabilities, and job skills. That is a much more stringent test than the one which is found in the SABIC plan, which requires that the jobs be local and that they pay at least 80% of pre-disability earnings. The failure to acknowledge the Social Security Administration's decision, or to offer some reasoned explanation why the plan administrator has come to a different conclusion under what appears to be a more lenient standard, is, on this record, further evidence of an arbitrary and capricious decision.

Beyond that, however, the balance of the decision-making process appears to have been reasonable. This is not a case where an examination of Mr. Potter would likely have yielded any results not already evident from the records submitted by his treating doctors or from the physical capacities evaluation, and the file reviewers spoke with both Dr. Hanna and Dr. Sole, so they were thoroughly informed of the bases for those physicians' opinions. See Calvert, supra, at 295 ("reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly"). Further, Dr. Petrie accepted the fact that Mr. Potter could not do fine manipulation nor perform his past job with SABIC; the key issue here is what else he could do, and a physical examination of Mr. Potter would not appear to have been particularly informative on that issue. Thus, aside from the two issues which, in the Court's view, preclude affirmance of the plan administrator's decision, there is no additional basis upon which Mr. Potter could be afforded relief.

VI.

Given that the plan administrator's decision may not be affirmed, the next question is what remedy the Court should order. Here, the problems giving rise to reversal are the lack of factual development or consideration of issues relating to Mr. Potter's vocational profile and the jobs which might be available to him in the specified geographic area and the failure to consider or distinguish (if possible) the award of social security benefits. These issues can be cured by remanding the case to the plan administrator for further development. When that is so, such a remand is the proper remedy. Cf. Sowers v. Sun Healthcare Group, Inc., 2008 WL 3285752 (S.D. Ohio August 8, 2008), citing Williams v. International Paper Co., 227 F.3d 706 (6th Cir. 2000)(an award of benefits by the District Court is

proper if there are no factual issues remaining to be determined).  Consequently, the Court will order a remand.

VII.

For the foregoing reasons, the Court grants plaintiff's motion for judgment on the administrative record (#17) and denies defendant's motion for summary judgment (#18).  The administrative decision denying Mr. Potter's claim for long-term disability benefits is reversed, and this case is remanded to the plan administrator for further proceedings in accordance with this Opinion and Order.  The Clerk shall enter judgment accordingly.

/s/ Terence P. Kemp
United States Magistrate Judge